**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**CAROLYN ANN MILLER,**

     **Plaintiff,**

**vs.**                  **CASE NO. 4:20-CV-00514-MW-MAF**

**EBS SECURITY, INC.,
a Florida corporation, and
PRINTELLA BANKHEAD,**

     **Defendants.**
_____/

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff, Carolyn Ann Miller, initiated this employment discrimination complaint under Title VII of the Civil Rights Act, the Age Discrimination in Employment Act; and the Americans with Disabilities Act. ECF No. 1. Miller's Third Amended Complaint, ECF No. 12, is the operative complaint. Defendants filed an answer. ECF No. 22. This cause is currently before the Court upon "Defendants' Motion for Summary Judgment." ECF No. 34. Miller filed a "Response in Opposition." ECF No. 36. Defendants did not file a reply. After careful review, for the reasons stated below, Defendants' Motion for Summary Judgment, ECF No. 34, should be **GRANTED;** and the case should be closed.

## I.  Allegations in Miller's Complaint, ECF No. 12.

Miller sued her former employer, EBS Security Inc. (EBS), and Printella Bankhead, the CEO. ECF No. 12. Generally, Miller alleges that EBS and a supervisor discriminated against her based on her race and gender; Miller is a black female. Id. Miller was a security guard at EBS for just twenty-six days, from August 15, 2019, until September 10, 2019. ECF No. 7.

According to Miller, on August 29, 2019, she sent a text message to Captain Manigault asking for information about the holiday schedule, but he avoided her, sent her to another co-worker for the answer, and gave her "paperwork." Id., pp. 4-5. Miller does not indicate what the "paperwork" was but believes this somehow violated her rights under the Health Insurance Portability and Accountability Act of 1996 (HIPPA). Id., p. 5. Miller alleges Manigault refused to communicate with her at all but said he would advise Bankhead. Id.

Lieutenant Deaner also refused to communicate with Miller. Id. Miller only generally claims that beginning August 15, 2019, she "felt like [Deaner] discriminated against [her] in every way such as scheduling, communication, code[s], rules, and ethics of the job." Id., p. 6. Miller provided no explanation or examples. The only encounter Miller raised in the complaint is that, on September 10, 2019, Miller arrived at her post at about 6:00 a.m. and asked

Deaner if he was the morning supervisor. Id., p. 5. Deaner responded that what he does was none of her business because he is the lieutenant. Id. Miller asked Deaner for an incident report, but he refused to give her one and walked away. Id., pp. 5-6. A few minutes later, Deaner returned and ordered Miller to remove her duty belt. Id., p. 6. Miller was unaware that, at the time, Deaner had Bankhead on speaker phone and privy to the encounter. Id. Bankhead told Miller to follow the directive. Id. Miller asked Bankhead if she was fired; Bankhead responded, "no," and promised to call Miller later. Id.

Bankhead called Miller back, explained that Deaner did not want Miller to return to work, and supported Deaner's decision. Id. Miller asked Bankhead to come to the worksite to assess the situation before making a final decision. Id. Miller believes that Deaner treated her differently from other employees because she is a black female. Id.

After termination, Miller had to find new employment, which paid her less money. Id., p. 10. Miller claims she is "about to lose [her] home, lost [her] medical insurance," and suffered from mild depression and mental stress as a result. Miller demands back pay, lost wages, and costs and fees. Id. Miller attached a copy of the Equal Employment Opportunity Commission's (EEOC) denial of her claims. Id., p. 13.

## II.   Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper:

> [i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

Accordingly, summary judgment should be entered only against

> a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citations omitted).

Thus, pursuant to Celotex and its progeny, a movant for summary judgment bears the initial responsibility of informing the court of the basis for her motion by identifying those parts of the record that demonstrate the nonexistence of a genuine issue of material fact. This demonstration need not be accompanied by affidavits. Hoffman v. Allied Corp., 912 F.2d 1379, 1382 (11th Cir. 1990). If the party seeking summary judgment meets the

initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the non-moving party to present sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).

It is the non-moving party's burden to come forward with evidence on each essential element of her claim sufficient to sustain a jury verdict. Earley v. Champion Int'l Corp., 907 F.2d 1077, 1080 (11th Cir. 1990). The non-moving party cannot rely solely on her complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material, but must respond with affidavits, depositions, or otherwise show there are material issues of fact which demand a trial. Fed. R. Civ. P. 56(e); Coleman v. Smith, 828 F.2d 714, 717 (11th Cir. 1987). The trial judge, at the summary judgment stage, does not weigh the evidence but rather determines whether there is a genuine issue for trial: "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Baldwin Cty., Ala. v. Purcell Corp., 971 F.2d 1557, 1563 (11th Cir. 1992). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."

<u>Walker v. Darby</u>, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing <u>Anderson</u>, <u>supra</u>).

The Supreme Court has stressed:

> [w]hen the moving party has carried its burden under rule 56(c) its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'

<u>Matasushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Anderson</u>, 477 U.S. at 247-48. Finally, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).

## III.   Defendants' Motion for Summary Judgment, ECF No. 34

Defendants argue they are entitled to summary judgment because Miller failed to establish a *prima facie* case of disparate treatment discrimination. ECF No. 34, pp. 15-16. According to Defendants, it is unclear what type of discrimination Miller alleges -- discriminatory, tangible

employment action or discrimination in the form of a hostile work environment. Id., p. 16. Nonetheless, Defendants maintain that neither claim can survive. Id.

Miller does not show that EBS treated similarly situated employees outside her classification more favorably and that she was qualified to do the job; therefore, Miller's claim of discriminatory action -- her termination -- fails. Id., p.17. Defendants argue that Miller was not qualified to do the job and was unable to perform her job without openly challenging and disrespecting her supervisor. Id., pp. 18-19. Defendants further argue that Miller presents no direct evidence of discrimination.

Even if Miller established a *prima facie* case, Defendants would still be entitled to summary judgment because there was a legitimate, non-discriminatory reason for terminating her employment that was not a pretext for discrimination. Id., p. 20. Miller was insubordinate, failed to follow company policies and procedures, failed to respect and adhere to Deaner's instructions; and other security officers complained about Miller's performance and her creating a negative work environment. Id.

## IV.   Miller's Response in Opposition, ECF No. 36.

Miller filed a response opposing the motion for summary judgment. ECF No. 36. Both parties agree that Miller is a member of a protected class

and was subjected to adverse employment action when she was terminated by Defendants. Id., p. 3. Miller argues that the reason there is no similarly situated comparator is because Defendants "manufactured allegations of misconduct." Id., p. 4. Miller maintains her behavior was no different than her male coworkers. Id.

## V.   Discussion

### A. Applicable Law

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on a person's race, color, religion, sex, or national origin. 42 U.S.C.S. § 2000e-2(a)(1). A plaintiff may prove discrimination through direct evidence or circumstantial evidence using the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Harris v. Shelby Cty. Bd. of Educ., 99 F.3d 1078, 1083 (11th Cir. 1996).

First, a plaintiff must establish a *prima facie* case. Id. To establish a *prima facie* case for disparate treatment, the employee must show that "(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees more favorably; and (4) she was qualified to do the job." McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008) (citing EEOC v. Joe's Stone Crab, Inc.,

220 F. 3d 1263, 1286 (11th Cir. 2000). Next, if the plaintiff satisfies these elements, the burden shifts to the defendant to produce a "legitimate, nondiscriminatory reason" for the adverse action. Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1323 (11th Cir. 2006). If this burden is met, the plaintiff has the burden to prove, by a preponderance of the evidence, that the reasons for the adverse action "are a pretext for unlawful discrimination." McCann, 526 F.3d 1373 (citing Burke-Fowler, 447 F.3d at 1323). At all times, a plaintiff has the burden to persuade the fact finder that the defendant intentionally discriminated against her. Id.

Once the plaintiff establishes a *prima facie* case of discrimination and the defendants met their burden of articulating a legitimate, nondiscriminatory explanation for its actions, the inquiry then becomes "whether the defendant intentionally discriminated against the plaintiff." Id.

> The plaintiff must, by either direct or circumstantial evidence, demonstrate by a preponderance of the evidence that the employer had a discriminatory intent . . . Moreover, if the defendant's proffered reasons are rejected, the trier of fact may infer the ultimate fact of intentional discrimination. Batey v. Stone, 24 F.3d 1330, 1334 (11th Cir.1994).

Id. Once the defendant has met the burden of production, the focus "is on the defendant's subjective intent and the motivation behind the defendant's adverse employment actions directed at the plaintiff." Harris, 99 F.3d at 1083.

B. Undisputed Facts

Miller had a fifteen-year career in corrections, until 2015, when she resigned from the Florida Department of Corrections (FDOC).[1] ECF No. 34-1, pp. 13-14; ECF No. 36-2, pp. 3. Then, in 2017, Miller started working as a guard "for G4S" in Jacksonville and, a year later, in Lakeland.[2] Id. Miller returned to Franklin County (Apalachicola), in 2019, to work as a guard for SYOTOS, a FEMA[3] contractor. ECF No. 34-1, pp. 14, 17; ECF No. 36-2, p. 3. There was no supervisor at SYOTOS, but FEMA employees would check the worksites periodically. ECF No. 34-1, p. 17.

When SYOTOS lost the FEMA contract, EBS "picked up" and "took over" effective August 15, 2019; so, Miller became an EBS employee, as did all SYOTOS employees. ECF Nos. 34-1, pp. 14, 17, 19, 102; 34-2; and 36-2, p. 3.[4] Lieutenant Deaner was the worksite supervisor for EBS. Deaner reported to Manigault; and Manigault, in turn, reported directly to the CEO, Printella Bankhead. Id. On August 15, 2019, the hiring date, Bankhead and

---

[1] Miller worked for the Franklin County Sheriff's Office beginning in 2000 and then went to work for the FDOC in 2007. ECF No. 34-1, pp. 13-14; ECF No. 36-2, p. 3.

[2] G4S is a private security company. ECF No. 36-2, p. 3.

[3] Federal Emergency Management Agency.

[4] EBS terminated Miller on September 10, 2019; accordingly, Miller worked for the company for just 26 days.

Manigault were present to facilitate the process of onboarding the SYOTOS security guards with EBS. 34-2. Miller's worksite was in Panama City, but Manigault and Bankhead were based in Jacksonville.[5] ECF Nos. 34-1, pp. 19-21; 34-2.

Manigault and Bankhead are both black; and five of the eight male guards at the Panama City worksite are black. ECF Nos. 34-2, 36-1. At the time, of the events in question, Miller was the only black female guard at the Panama City worksite. ECF Nos. 34-1, p. 18; 36-2, p. 4. 7. Miller repeatedly called Bankhead to complain about Deaner. ECF No. 34-2. Given various complaints, Bankhead visited the worksite to meet with each security guard separately. Id. Miller was replaced by a black female, Angeleen Sutton. ECF Nos. 34-2, p. 4; 36-2, p. 39.

C.  Miller's Deposition Testimony and Affidavit

1. *Miller's Employment with EBS*

Miller provided sworn testimony in the form of a deposition and an affidavit. ECF Nos. 34-1 and 36-2. According to Miller, the change from SYOTOS to EBS was significant, at least for her, because, at SYOTOS, no one "really actually checked on [employees], besides the FEMA or head of

---

[5] Miller's worksite was, approximately, 60-65 miles from her home in Apalachicola. ECF No. 34-1, pp. 20-21. Miller stated that she would often stay at her sister's house to be close to work, which was approximately a ten-minute commute. Id., pp. 15, 21.

security." ECF No. 34-1, p. 18. EBS, however, had a lieutenant and a captain supervising the employees. Id. Miller's fellow guards at the worksite were all male; and she was likely "older than all of them." Id.

In Miller's opinion, "[] Deaner was . . . a very young person, and [she] felt . . . he wasn't really ready for a lot of that responsibility." Id. Miller claimed she did not share her opinion with anyone else. Id. According to Miller, during the first week, Deaner made negative comments about women, but this related to his ex-wife. Id., pp. 32-33. The following week, Deaner started avoiding Miller. Id., p. 33.

Miller claimed that Deaner "would get very offended when [she] . . . asked certain questions concerning the job" but not with "the guys." Id. For example, on the occasion Miller asked Deaner if he was the supervisor for the day, he responded it was "none of [her] business what he does, and he's the lieutenant." Id., p. 19. When Miller asked about anything related to the job, Deaner walked away without answering her. Id. Miller said she had to get the answers "from the guys." Id. She gives no details about what questions Deaner refused to answer. ECF No. 36-2, p. 4. On at least one occasion, Deaner told Miller that he was "not going to answer any of [her] questions" and, if she needed to know anything, to contact Bankhead. ECF No. 34-1, pp. 19, 31.

Miller felt Deaner discriminated against her by the way he spoke to her, which she described only as "dissing," "hard and harsh." Id., p. 68. Deaner gave employees improper directives like instructing them to go "outside the gates to say something to people" when that area was not FEMA property. Id., p. 69. Miller assumed Deaner's attitude with her was because he felt intimidated by "a woman [that] could possibly . . . know a little bit more than [him]." Id., p. 70. Miller admitted she probably questioned Deaner more than other employees and that her questions implied Deaner failed to make considerations or was not operating in the right way. Id., pp. 38, 71.

During the second week of August, Miller reported Deaner was treating her differently.[6] Id., p. 33. In her affidavit, Miller vaguely states than she "felt like [Deaner] discriminated against her in every way such as [s]cheduling, [c]ommunication, [c]ode, [r]ules, and [e]thics of the [j]ob. He treated no other employee like that." ECF No. 36-2, p. 5. However, Miller does not provide any example other than Deaner did not inform her that a prospective new employee was not hired because he failed the background check. Id., p. 4. Deaner advised the male employees that this person might pose a security

---

[6] This time frame is implausible given that (1) EBS took over the contract on Thursday, August 15, 2019, (2) Deaner's conversation with Miller about his ex-wife was during Deaner's first week of employment, and (3) Deaner stopped talking with Miller one week later. If Miller reported Deaner was treating her differently, it would have been near the end of the month.

risk when returning the pre-issued equipment, which included a gun, but did not advise Miller. Id.

On August 29, 2019, Miller sent a text message to Manigault about Deaner. Id., pp. 34, 53-54. Manigault told Miller he would forward her text to Bankhead to call Miller back. Id. When Bankhead did not call, Miller reached out directly to her to see if Manigault forwarded the text message. Id., p. 35. Bankhead confirmed she received the text, would visit the worksite, and planned to speak to Deaner because other employees complained about him. Id., pp. 33-35. Miller admitted she called Bankhead constantly after sending the text. Id., p. 61. At one point, Miller confirmed she "complain[ed]" to Bankhead about "job related problems" nearly every day even though her employment lasted just twenty-six days. Id., p. 78. In contradiction, in her affidavit, Miller stated Bankhead "never" called her. ECF No. 36-2.

Miller waivered back and forth during her deposition about the number of times Bankhead came to the worksite. At one point Miller stated Bankhead never came back to the worksite. ECF No. 34-1, p. 61. Then Miller said Bankhead "came down one time within the first couple of weeks or so . . . talked to everyone about the phone calls from me and I'm pretty sure the other workers." Id., p. 60. Apparently, the only other time Bankhead came to the worksite was when EBS signed the FEMA contract. Id., pp. 60, 64. In

Miller's opinion, Bankhead should have come to the worksite more often --

even if it required the four-hour drive each way from Jacksonville -- given the

employee complaints and despite Miller's short employment. Id., p. 62.

Manigault also visited the worksite. Id., p. 64.

During deposition, Miller was presented with the statements of two

coworkers, Samuel Best and Hal Premer. Id., pp. 23-30. Mr. Best provided

the following statement:

> I have told Lieutenant Deaner that Mrs. Miller keeps asking
> all the guards in the morning what Deaner said to the
> guards during the workday, gathering information and rally
> at regards in a negative way and talk disrespectful about
> Deaner and EBS security.

Id., pp. 23-24. According to Mr. Best, Miller was "disrespectful to [] Deaner

by challenging his authority in front of staff verbally and on the radio [by] not

answering [] Deaner's calls and [with her] rude behavior in person."

Allegedly, Miller told the guards one morning, "[] Deaner has authority over

the guards" but no experience working for FEMA, unlike herself; and Deaner

should not have authority because Miller was there longer. Id., p. 26. Miller

denied Mr. Best's allegations. ECF No. 36-2, pp. 5-6.

According to Mr. Premer's statement, Miller "would take longer than

necessary to relieve [him] from his post on hot days." Id., pp. 26-27. Miller

outright denied Mr. Best's and Mr. Premer's claims, stating their assertions

are "not true," and denied discussing anything with coworkers about Deaner. <u>Id.</u>, pp. 24-27. Miller denied she ever had an argument or dispute with any employees about any issue. <u>Id.</u>, p. 27. Miller claimed that Mr. Premer was distant and stopped talking to her because, while at SYOTOS, he was directed to apologize for making negative statements to her. <u>Id.</u>, p. 28. Miller said she "didn't even talk to the guys in the morning. They would talk amongst themselves men stuff." <u>Id.</u>, p. 30. Miller maintained no one counseled her about her attitude towards Deaner, rather, she informed Manigault and Bankhead about Deaner's attitude toward her. <u>Id.</u>, pp. 13, 25, 45-49; <u>see</u> <u>also</u> ECF No. 36-2, p. 6.

On her last day of employment, Miller asked Deaner if he would be the supervisor for the day. <u>Id.</u>, p. 51. Deaner responded he did not have to answer to Miller and that she was on "thin ice." <u>Id.</u>, p. 51. When Miller asked Deaner what he meant by that, he walked off. <u>Id.</u> Miller then went to Deaner and asked for a grievance form, but he denied her request. <u>Id.</u> Miller returned, "Yeah? We are all allowed to have a grievance . . . if we disagree with something on the job." <u>Id.</u> Deaner walked away from Miller. <u>Id.</u>, pp. 51-52. Later, Deaner returned and told Miller to remove her duty belt three times. <u>Id.</u>, p. 52. At Deaner's first request, Miller asked, "why," and, then, whether she was fired. <u>Id.</u> By Deaner's third demand, Miller heard

Bankhead order, "just do what he said to do." Id. Unbeknownst to Miller, Deaner had Bankhead on speaker phone listening to the entire encounter. Id. Miller asked Bankhead if she was being sent home or fired. Id. Bankhead said "no . . . just go home for today." Id.

Three hours later, Bankhead called Miller to inform her Deaner did not want Miller back on the job; and Bankhead supported that decision. Id. Miller asked Bankhead to visit the worksite and "assess the situation." Id. But Bankhead refused, stood by Deaner's decision, and terminated Miller's employment. Id., pp. 14-15, 52. Within three or four weeks, Miller returned to her previous employer, G4S. Id., pp. 14-15. EBS replaced Miller with another black female guard, Angeleen Sutton. Id., p. 39. Miller later learned that Deaner was terminated sometime in 2021. Id., p. 63.

### 2. Miller's Testimony Regarding her EEOC[7] Claim

Miller filed an EEOC claim for discrimination. Laneetra Harris documented Miller's claims. Id., pp. 72-77. At deposition, Miller was presented with her EEOC claim form, filed in December 2019, which reported Bankhead contacted Miller offering her employment at a different EBS worksite, but Miller declined for fear of termination without cause again. Id., p. 76. But during her testimony, Miller denied ever reporting to EEOC the

---

[7] U.S. Equal Employment Opportunity Commission.

offer of reinstatement or ever speaking with Bankhead after termination. Id. Similarly, when questioned about a text message from Bankhead "good morning, ma'am, did you consider coming back? Thanks, Chief," Miller could not recall receiving the text and insisted she and Bankhead never discussed a return to work. Id., p. 89.

Miller testified that her termination caused her to suffer "emotional distress . . . from trying to stabilize [her] bills" since she would make less money and the cost of gas increased because the commute to her new job was 60 miles and she didn't stay with her sister. Id., pp. 77-78. Miller did not seek any treatment for emotional distress. Id., p. 78.

### 3. *Miller's Contradictory Testimony*

Overall, Miller's deposition is a long-winded set of contradictions. Miller accused Deaner of ignoring her, speaking to her harshly, and giving her incorrect instructions on the job. Id., pp. 19, 33-35. But Miller also maintained that Bankhead confided that other employees complained about Deaner's leadership, so much so that Bankhead was "willing to make a trip down there." Id., pp. 62, 68. Miller emphasized that the reason Manigault and Bankhead made the trip was because of "all our complaints," not just hers. Id., pp. 35-36. This contradicts Miller's assertion that she was somehow singled out by Deaner for maltreatment. In fact, Manigault had to come to

the worksite "to counsel Mr. Deaner" (not Miller) because Manigault "do[es]n't like the way that . . . he is doing things . . . [and] Deaner was not doing things the way that he was supposed to be doing them." Id., p. 53. In fact, EBS fired Deaner sometime after Miller was terminated. Id., p. 63.

In another contradiction, Miller alleged Deaner ignored her so much that she had to go and get job information from her male coworkers but then maintained she "didn't even talk to the guys in the morning"; they would all talk "amongst themselves men stuff." Id., p. 19. Still, Mr. Best and Mr. Premer did not speak to Miller at least stemming from their SYOTOS employment. Id., p. 30.

Miller claimed she had multiple conversations with Bankhead and Manigault but then denied, refused to admit, or otherwise could not recall a series of text messages to and from them even when presented with actual copies of those messages. Id., pp. 34-110. When presented with various exhibits, Miller denied her signature on nearly every document including receipt of EBS's associate handbook, employee paperwork, and the job description. Id., pp. 40-45. She denied being written up about her behavior on September 10, 2019. Id., pp. 48-49. Miller denied any communication with Bankhead about her return to work for the company after termination even when presented with the EEOC forms and text messages documenting

Bankhead's offer to return to work at another EBS worksite. Id., p. 72, 76, 80. Miller outright denied reporting the return-to-work offer to the EEOC despite the forms presented to her. Id., p. 80.

When presented with text message exhibits, Miller would alternate between admitting to and then denying having sent or received texts from Bankhead relating to continued employment, time adjustments, and receiving her pay. Id., pp. 83-88, 91-99. This is true even though the messages came from her phone. Id. At one point, Miller was unwilling to admit that any of texts came from her phone at all. Id., pp. 99-108. Miller claimed at some point she gave her phone to her daughter, but as the deposition progressed, Miller eventually claimed that the phone was stolen from her daughter by a relative so the texts could have been from either one of them. Id., pp. 88, 109. Finally, Miller returned to her previous posture that she did not recall sending Bankhead any text messages. Id., p. 110.

D. Bankhead's Sworn Declaration, ECF No. 34-2

When Bankhead told Miller that Deaner would be the supervisor, Miller responded that Deaner "seems a little too young." ECF No. 34-2. During the first two weeks of employment, both Miller and Deaner complained to Bankhead about the other. Id. On August 21, 2019, Mr. Premer complained to Bankhead about Miller not relieving him from his post on time; Miller had

remained indoors and left Mr. Premer "outside in the sweltering heat longer than necessary." Id. Mr. Premer also reported to Bankhead that Miller "had been openly questioning . . . Deaner's instructions to the group." Id. According to Bankhead, on several occasions, security guards called her complaining that Miller was "trying to rally them up in a negative way against" Deaner. Id., p. 3. FEMA also contacted Bankhead to inform her that employees were "huddled up talking with" Miller about the things she disliked. Id. As a result, Deaner changed his hours to be present at the beginning of the second shift to ensure the guards remained on task. Id.

Bankhead stated that in response to Miller's repeated complaints, she instructed Deaner to have a meeting with all the security guards to get on the same page. Id. Bankhead attended this meeting and met with the guards separately but spent the most time with Miller. Id. Following this investigation and the discussions with Manigault, Bankhead determined Miller's discrimination claims were unfounded. Id. The following week, Bankhead received a report that Miller was rude on the radio with Deaner and other officers. Id. Bankhead spoke with Miller and told her to stop because FEMA employees might hear it and it was not the image EBS wanted to present. Id.

On September 10, 2019, Bankhead spoke with Deaner on the phone and decided to terminate Miller's employment for several reasons: Miller

exhibited insubordinate behavior toward Deaner and did not respect and adhere to Deaner's instructions; she failed to follow company policies and procedures; there were complaints from fellow officers about Miller's performance and creating a negative work environment; and Miller's inability to correct her behavior after counseling from Bankhead and Manigault on multiple occasions. Id., pp. 3-4. The next day, EBS replaced Miller with another black female, Angeleen Sutton. Id., p. 4.

E. Sworn Declarations by Fellow Guards

Samuel Best, a black[8] security guard who worked with Miller, stated that in August 2019, Miller asked him and other security guards what Deaner said during the workday. ECF No. 34-3, p. 1. In Mr. Best's opinion, Miller was gathering information to rally them in a negative way and speaking disrespectfully about Deaner and EBS. Id., pp. 1-2. Mr. Best shared his observations and opinions with Deaner. Mr. Best stated that Miller would also challenge Deaner's authority in front of others by correcting him while he was speaking on the radio and complained to Mr. Best and other officers about Deaner's authority over them when he never worked for FEMA and she had been there longer. Id. Mr. Best stated that Miller did not like Deaner, was

---

[8] Samuel Best, Benjamin Sheffield, Ephraim Goodwin, Corwin Raymond, and Ricky Hall are black males who were under Deaner's supervision. ECF No. 36-1, p. 6.

aggravated that Deaner had authority over her, and was insubordinate toward Deaner. Id.

F. Miller's EEOC Claim

Miller filed a pre-charge inquiry with the EEOC. ECF No. 34-4. Although Miller claims both racial and gender discrimination in the instant case, in her EEOC filing, Miller alleged that EBS discriminated against her based on her gender only. Id., pp. 1-2. She did not check any other category (race, color, religion, national origin, age disability, genetic information) other than under "retaliation," she complained to her employer about job discrimination. Id., p. 2. The EEOC form asks, "What happened to you that you think was discriminatory and when did it happen?" Id., p. 2. Miller limited her allegation to the events of September 10, 2019, when she asked for "a[n] incident report form to write up the way the supervisor was talking to [her] that morning" but was told to go home for the day; and Deaner was responsible. Id., p. 2.

G. Miller Has Not Established a *Prima Facie* Case of Discrimination

Miller does not allege that racial discrimination was the standard operating procedure at EBS. At best, Miller's allegations involve the occurrence of isolated, "accidental" or sporadic discriminatory acts. See International Brotherhood of Teamsters v. United States, 431 U.S. 324, 336

(1977). To establish a *prima facie* case of discrimination based on disparate treatment, Miller must show that she is (1) a member of a protected class, (2) who was subjected to an adverse employment action, (3) other similarly situated employees were treated more favorably, and (4) that she was qualified to do the job. McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008) (citing EEOC v. Joe's Stone Crab, Inc., Miller simply cannot meet all four elements.

Although the Court views the evidence in the light most favorable to Miller, she ultimately bears the burden of coming forward with evidence on each essential element of her claim sufficient to sustain a jury verdict. Earley, 907 F.2d at 1080. The first two elements are easily established. Miller is, indeed, a member of a protected class both by her race and gender, as a black female, and was subjected to an adverse employment action when EBS terminated her. As to the fourth element, evidently, Miller was also qualified to do the job. Miller had a fifteen-year career as a correctional officer and then worked as a security guard for private companies for approximately two years before she became an EBS employee.[9] Miller also returned to

---

[9] In her Response, Miller states that she was a guard for a private security company for four years prior to her employment with EBS. ECF No. 36, pp. 6. Yet, in her affidavit, Miller states that even though she resigned from the FDOC in 2015, she began working for a private security company two years later, in 2017. ECF No. 36-2, p. 3. Miller's employment with EBS began on August 15, 2019. Id.

work as a guard for one of her previous employers, just three weeks after EBS terminated her. Interestingly, during Miller's deposition, it was suggested, if not revealed, that EBS offered Miller an opportunity to return to work. ECF No. 34-1, p. 76. It follows then that, if Miller was unqualified for her job, there would be no discussion of her return to EBS at any time. The position that EBS maintained at Miller's deposition that they gave her an opportunity to return to work and the argument now that Miller was unqualified for the job so that she cannot meet the elements of a *prima facie* case are simply incompatible. Miller was qualified for her position.

Nonetheless, Miller cannot satisfy the third element. Miller's argument in her response that "no similarly-situated comparator exists" is a bit misleading. ECF No. 36, p. 4. First, Miller was not the only black guard at the worksite at the time -- more than half of the male guards are black; and the remaining three guards are white males. ECF No. 36-1, p. 6.

Second, Miller was not the only black female guard employed by EBS even though she was the only one at the Panama City worksite. When Miller was terminated, EBS replaced Miller with Angeleen Sutton. ECF Nos. 34-2, p. 4; 36-1, p. 5. Ms. Sutton is a black female guard with experience at the Panama City worksite. Furthermore, Manigault (Deaner's supervisor) and Bankhead (the CEO) are black. ECF No. 34-2, pp. 1-2. Miller makes no

allegations that any other black employee was treated in a discriminatory way. Aside from her own personal opinion, Miller does not provide any evidence that the white employees were treated better than her or, for that matter, better than any of the black employees. Nor does Miller make any argument that male guards (regardless of race) were treated more favorably than her. In fact, Miller's own testimony cuts against her argument. Miller alleged that because of "all our complaints" about Deaner, Bankhead was "willing to make a trip down there"; and, ultimately, Bankhead and Manigault visited the worksite for that reason. ECF No. 34-1, pp. 35-36, 62, 68. Repeatedly, during her deposition, Miller maintained that everyone had complaints about Deaner.

Miller admitted that she asked Deaner more questions than her colleagues and implied that he was not doing his job properly. Id., pp. 38, 71. Even assuming Deaner refused to respond to Miller's inquiries directly, Miller admits that Deaner directed her to get information from another supervisor, namely, Bankhead. It is significant that Miller had frequent and direct access to Manigault and Bankhead about the conditions of her employment. Miller's general allegations that Deaner would not answer her questions or discriminated against her in "every way" with scheduling, rules, and communications are, quite frankly, vague and unsupported. Miller maintains

that Deaner offered other opportunities and information to male employees but not to her, which interfered with her ability to perform her job, but she fails to support that with evidence. ECF No. 36, p. 8. Miller states in her response that the only opportunity afforded to others but not her was Deaner's offer to work on Labor Day. Id., p. 5. The only information Deaner seems to have withheld from Miller is the fact that a person who was not hired, might pose a security risk when returning pre-issued equipment. Miller offers no explanation about how any of this interfered with her ability to perform her job. This without more does not support discrimination claims.

As outlined above, Miller's entire case contains repeated, overly broad generalizations of acts she believes are the result of discrimination. Miller simply has not produced sufficient evidence to show that she was treated less favorably than a similarly situated employee outside her protected group. Miller's general assertions, without more, are simply insufficient to survive a motion for summary judgment. Miller cannot rely solely on her complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material – her affidavits, depositions, or other evidence must show there are material issues of fact related to discrimination which demand a trial. Fed. R. Civ. P. 56(e); Coleman, 828 F.2d at 717.

Ultimately, Miller fails to make out a *prima facie* case of racial and gender discrimination because she was replaced with a black female and general allegations cannot defeat a motion for summary judgment. Here, Miller's evidence is "merely colorable, or is not significantly probative"; thus, Defendant's motion for summary judgment motion should be granted. Anderson, 477 U.S. 242 at 249-50.

For the same reasons, Miller cannot support a claim of disparate treatment discrimination in the form of a hostile work environment. To establish such a claim, Miller must show that (1) she belongs to a protected group, (2) she has been subject to unwelcome harassment, (3) the harassment was based on her race or gender, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create an abusive working environment, and (5) there is a basis to hold the Defendants liable. See Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 808 (11th Cir. 2010).

Miller belongs to a protected class but there is no indication that she was subjected to harassment based on her race or gender. Moreover, Miller fails to show that Deaner treated her differently from the other guards on the worksite, whether white or black. This is particularly so, if the Court accepts as true Miller's claims that other guards at the worksite complained about

Deaner. Miller might be able to show that Deaner's behavior was offensive, but she has not established it was discriminatory. See Richardson v. Bay Dist. Sch., 2019 U.S. Dist. LEXIS 64279 at *10 (N.D. Fla. May 6, 2013).  The Court need not address the remaining elements supporting a hostile work environment claim because Miller would need to prevail on all five elements. Summary judgment in favor of Defendants is proper.

## VI.   Conclusion and Recommendation

For the reasons stated above, it is respectfully **RECOMMENDED** that Defendants' Motion for Summary Judgment, ECF No. 34, be **GRANTED**. It is further recommended that the case be **CLOSED**.

**IN CHAMBERS** at Tallahassee, Florida on October 17, 2022.

> **s/ Martin A. Fitzpatrick**
> **MARTIN A. FITZPATRICK**
> **UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions. See 11th Cir. Rule 3-1; 28 U.S.C. § 636(b)(1)(C).